FILED

2022 Sep-30  AM 08:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **JOSHUA SPEARMAN,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | |
| **SOCIAL SECURITY** ) | **Case No.: 7:20-cv-01360-AMM** |
| **ADMINISTRATION,** ) | |
| **Commissioner,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OF DECISION**</u>

Plaintiff Joshua Spearman brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.     Introduction

Mr. Spearman claimed disability due to carpal tunnel in both hands and wrists, cubital tunnel of ring and pinkie fingers to elbow in both arms, right shoulder rotator tear and arthritis, bilateral spondylolysis, disc space narrowing, anxiety, flat-footedness, ankle and knee problems, enlarged heart, narcolepsy, and insomnia. R. 64–65. He has at least a high school education, is able to communicate in English,

and has past relevant work experience as a machine operator, machine packager, infantryman, and composite job of forklift operator and gas-cylinder inspector. R. 24.

The Social Security Administration ("SSA") initially found Mr. Spearman disabled in a February 11, 2015 determination. R. 15. The SSA found his disability onset date to be February 15, 2013. R. 15. However, on September 7, 2018, the SSA determined that Mr. Spearman was no longer disabled since September 1, 2018. R. 15, 74–88. The determination was upheld after a disability hearing at the state agency level. R. 15, 105–21. Mr. Spearman filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 15, 126. That request was granted. R. 130–32. Mr. Spearman received a video hearing before ALJ Cynthia W. Brown on December 5, 2019. R. 15, 33–61. At the hearing, Mr. Spearman appeared and testified without the assistance of an attorney or other representative. R. 15. On March 16, 2020, ALJ Brown issued a decision, finding that Mr. Spearman's disability ended on September 1, 2018 and he had not become disabled again since that date. R. 16. Mr. Spearman was thirty-six years old at the time of the ALJ decision. R. 24–25.

Mr. Spearman appealed to the Appeals Council, which denied his request for review on July 14, 2020. R. 1–6. After the Appeals Council denied Mr. Spearman's request for review, R. 1–6, the ALJ's decision became the final decision of the

Commissioner and subject to district court review. On September 11, 2020, Mr. Spearman sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.     The ALJ's Decision

Generally, an ALJ follows a five-step evaluation to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. When the issue is cessation of disability benefits, however, the ALJ must follow a different evaluation to determine whether a claimant's disability benefits should continue. *See* 20 C.F.R. § 404.1594(f).

An ALJ may terminate a claimant's benefits upon finding that there has been medical improvement in the claimant's impairment or combination of impairments related to the claimant's ability to work and the claimant is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f)(1). To determine whether disability benefits should be terminated, the ALJ must conduct a multi-step evaluation process and determine:

(1) Whether the claimant is engaging in substantial gainful activity;

(2) If not gainfully employed, whether the claimant has an impairment or combination of impairments which meets or equals a listing;

(3) If impairments do not meet a listing, whether there has been medical improvement;

(4) If there has been improvement, whether the improvement is related to the claimant's ability to do work;

(5) If there is improvement related to claimant's ability to do work, whether an exception to medical improvement applies;

(6) If medical improvement is related to the claimant's ability to do work or if one of the first groups of exceptions to medical improvement applies, whether the claimant has a severe impairment;

(7) If the claimant has a severe impairment, whether the claimant can perform past relevant work;

(8) If the claimant cannot perform past relevant work, whether the claimant can perform other work.

*See* 20 C.F.R. § 404.1594(f).

The "medical improvement" required at step three is defined by agency regulation as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled." *Id.* § 404.1594(b)(1). A finding that there has been a decrease in medical severity "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.* More specifically, whether medical severity has decreased "is determined by a comparison of prior and current medical evidence which must show that there have been changes

4

(improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." *Id.* § 404.1594(c)(1); *see also Freeman v. Heckler,* 739 F.2d 565, 566 (11th Cir.1984); *Vaughn v. Heckler,* 727 F.2d 1040, 1043 (11th Cir.1984).

The ALJ found that Mr. Spearman's comparison point decision, or the most recent favorable medical decision finding disability, is the determination dated February 11, 2015. R. 17. At the time of the comparison point decision, Mr. Spearman had the following medically determinable impairment: anxiety disorder. R. 17. Mr. Spearman was also found to have a "history of pes planus with plantar fasciitis, heart enlargement, right shoulder surgery with osteoarthritis, lumbar degenerative disc disease, knee and ankle sprains, gastroesophageal reflux disease (GERD), bilateral cubital and carpal tunnel syndrome with left carpal tunnel release, lower extremity neuropathy, sleep disturbance, obesity, and depression." R. 17. At the time, Mr. Spearman had an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 to support a finding of disability. R. 17.

The ALJ found that Mr. Spearman had not engaged in substantial gainful activity through the date of her decision. R. 17. The ALJ further found that Mr. Spearman had the same impairments as those identified in the comparison point decision, however Mr. Spearman had undergone right carpal tunnel release surgery. R. 17. The ALJ found that since September 1, 2018, Mr. Spearman had not had an

impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 17. The ALJ decided that Mr. Spearman had the following severe physical impairments: right shoulder and lumbar impairments. R. 18. The ALJ also found that Mr. Spearman did "not have a severe mental impairment or combination of mental impairments." R. 18–20. The ALJ found that Mr. Spearman's anxiety, pes planus with plantar fasciitis, heart enlargement, knee and ankle impairments, GERD, cubital and carpal tunnel syndrome with carpal tunnel releases, neuropathy, obstructive sleep apnea, narcolepsy, obesity, and depression were "nonsevere" impairments. R. 18, 20–21. Overall, the ALJ determined that Mr. Spearman did not have an impairment or combination of impairments that "met or medically equaled the severity of an impairment listed" to support a finding of disability. R. 17.

The ALJ found that "[m]edical improvement occurred on September 1, 2018." R. 19. The ALJ found that Mr. Spearman's "medical improvement is related to [his] ability to work because, by September 1, 2018, [his comparison point decision] impairments no longer met or medically equaled the same listing that was met at the time of the" comparison point decision. R. 19.

The ALJ found that Mr. Spearman's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence." R. 22. The ALJ found that since

6

September 1, 2018, Mr. Spearman had the "residual functional capacity to perform a light level of exertion" with certain limitations. R. 21. The ALJ determined that Mr. Spearman may occasionally: balance; stoop; kneel; crouch; crawl; climb ramps and stairs; climb ladders, ropes, and scaffolds; and reach with the right upper extremity. R. 21. The ALJ determined that Mr. Spearman may frequently reach with his upper left extremity. R. 21. Further, the ALJ determined that Mr. Spearman must avoid concentrated exposure to vibration and any exposure to hazards. R. 21.

According to the ALJ, Mr. Spearman has been "unable to perform past relevant work" since September 1, 2018, he was "a younger individual" on September 1, 2018, and he has "at least a high school education," as those terms are defined by the regulations. R. 23–24. The ALJ determined that "[s]ince September 1, 2018, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 24. Because Ms. Pearson's "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Mr. Spearman would be capable of performing since September 1, 2018. R. 25. That expert testified that there are indeed a

significant number of such jobs in the national economy, such as a marker, cashier, and garment sorter. R. 25.

Based on these findings, the ALJ concluded that Mr. Spearman's "disability ended on September 1, 2018, and [he] has not become disabled again since that date." R. 16, 25. Mr. Spearman now challenges that decision.

## III. Factual Record

The medical records included in the transcript and referenced by the parties span many years. Mr. Spearman summarizes the evidence before the comparison point decision where he was awarded benefits as follows:

> Mr. Spearman has a history of carpal tunnel syndrome, cubital tunnel syndrome, and bilateral neuropathies in his wrists and elbows, confirmed by nerve conduction studies dated August 15, 2013 for which left release was recommended. Mr. Spearman underwent left carpal tunnel release on November 4, 2014. Prior to surgery on his left wrist, he is noted to complain of bilateral decreased sensation in his hands with numbness and tingling, welling, and losing grip.

> Mr. Spearman has a history of shoulder arthritis with associated pain and decreased range of motion for which he underwent right shoulder surgery on May 2, 2013 with physical therapy to follow. Xray of his right shoulder performed October 2012 showed labral detachment with possible continuation of labral tear.

> Mr. Spearman has a history of back pain with lumbar degenerative disc disease. Xrays performed January of 2014 indicated bilateral spondylosis at L5 with disc space narrowing. He is noted to exhibit tenderness and decreased range of motion in his lumbar spine.

> Mr. Spearman has a history of sleep disorder with complaints of insomnia, despite treatment. He was suspected to have obstructive sleep

apnea and narcolepsy. Sleep studies performed in April and May 2014 were negative for sleep apnea but highly suggestive of true narcolepsy.

Mr. Spearman has a history of anxiety and depression with complaints of anxiety, depression and insomnia for which he participated in therapy and received medication management.

Doc. 16 at 6–7 (internal citations omitted).

After the comparison point decision, February 11, 2015, Mr. Spearman's medical records reveal the following evidence related to his claim for benefits.

On September 27, 2018, X-rays were taken of Mr. Spearman's right shoulder, right ankle, lumbar spine, and right knee. R. 954, 1006–09. The impression of the right shoulder was: "1. Widened AC joint space is new from prior, presumably postoperative. 2. Moderate glenohumeral joint osteoarthritis. 3. Possible shallow chronic Hill-Sachs deformity." R. 954. The right ankle X-rays found: "No obvious soft tissue abnormality. No fracture or dislocation identified. Ankle mortise is preserved. Joint spaces are well preserved." R. 1007. The lumbar spine X-rays showed: "1. Grade 1 anterolisthesis of L5 on S1, possibly secondary to L5 spondylolysis although difficult to confirm on this study. 2. Moderate degenerative disc disease with degenerative facet arthropathy at L5-S1 as well." R. 1008. The right knee X-rays showed: "Joint spaces appear preserved. No fracture or dislocation identified. No signs for significant joint effusion." R. 1009.

Mr. Spearman presented to cardiology at the Veterans Administration on October 26, 2018 for an echocardiogram, which was interpreted as follows: "Left

ventricular systolic function is normal. LVEF is 64% by Simpson's Biplane[.] Normal left ventricular diastolic function[.] The left atrial size is normal. The right ventricular systolic function is normal. Right atrial pressure estimate = 0 – 5 mm Hg." R. 784–87. He underwent an ECG on October 29, 2018, which was normal. R. 784.

Ms. Spearman presented to the Veterans Administration for a kinesiotherapy consult on November 9, 2018 where he received a knee brace and an ankle brace. R. 783–84.

Mr. Spearman presented to the Veterans Administration for a podiatry consultation on December 4, 2018. R. 774–76. He reported arch and heel pain that increased when standing and walking and was diagnosed with plantar fasciitis and pes planus of the bilateral feet. R. 775–76.

Mr. Spearman presented to the Veterans Administration for an initial physical therapy assessment on December 4, 2018. R. 776. Mr. Spearman reported lower back pain and right knee and ankle pain. R. 776. The examination revealed knee instability, and Mr. Spearman reported that he "has pending knee brace." R. 776. It was recommended that Mr. Spearman see an orthopedic doctor for further evaluation and use his knee brace. R. 776. The physical therapy notes discuss a September 27, 2018 X-ray of the right knee that showed: "Joint spaces appear preserved. No

fracture or dislocation identified. No signs for significant joint effusion. . . . Unremarkable right knee." R. 778.

Mr. Spearman underwent an MRI of his right knee on January 4, 2019. R. 796–99. The conclusion was: "No internal derangement identified in the right knee." R. 798. Mr. Spearman also underwent an MRI of his lumbar spine on January 4, 2019. R. 799–800. The conclusion was: "Pars defects at L5 with grade 1 anterolisthesis resulting in severe bilateral neural foramina narrowing and exiting nerve compression. There is posterior disc herniation at this level also contributing to this neural foramina narrowing." R. 800.

Mr. Spearman again presented to the Veterans Administration for an initial physical therapy assessment on his right knee and lower back on February 4, 2019. R. 750. Mr. Spearman reported that his right knee pain was "near constant" and a "4/10." R. 751. He also stated that his right knee feels "unstable." R. 751 (cleaned up).

Mr. Spearman was seen for a chiropractic consult on November 26, 2018, with a chief complaint of lower back pain. R. 779–80. He reported that activity makes his pain worse, and that his pain was an ache and throbbing. R. 780. He was diagnosed with chronic mechanical back pain, L5 spondylolisthesis. R. 782. He was encouraged to "explore conservative forms of management and take part in active rehabilitation to improve function," and his prognosis was "good." R. 782. He was

encouraged to exercise three to four times per week – to include walking, elliptical, stair stepper, stationary bicycle, or swimming. R. 782–83.

Mr. Spearman was seen on December 21, 2018, January 7, 2019, January 22, 2019, February 12, 2019, and March 8, 2019, by a chiropractor for the Veterans Administration for low back pain. R. 747–48, 753–56, 765–66, 767–69, 1079–81. His assessment was "better," he was encouraged to "explore conservative forms of management and take part in active rehabilitation to improve function," and his prognosis was "good." R. 748–49, 754–55, 765, 768, 1079–80. He was encouraged to exercise three to four times per week – to include walking, elliptical, stair stepper, stationary bicycle, or swimming. R. 749, 755, 766, 768, 1080. Mr. Spearman had a chiropractor visit on April 8, 2019, when he reported that his back pain was stable. R. 1000. His prognosis was listed as "good," and he was advised to seek urgent care for his ankle after slipping down a hill. R. 1000–01.

Mr. Spearman presented for a Veterans Administration mental health outpatient appointment on January 18, 2019. R. 757. He reported being nervous and suffering from worry and anxiety. R. 757. His anxiety was classified as "moderate," and his affect was "anxious." R. 758. Mr. Spearman reported taking Duloxetine for anxiety but that he didn't like the side effects, and he "indicated [he] really [didn't] like to take medication." R. 760. Mr. Spearman presented for a Veterans Administration mental health outpatient appointment on March 1, 2019. R. 1083. He

12

reported that he "worr[ied] about nonsense." R. 1083 (cleaned up). He complained that he continues to worry, is tired, hurts all over, and is not tolerating his C-PAP. R. 1083. He also complained of being forgetful, dizzy, and having trouble concentrating. R. 1083. His anxiety was classified as "mild" and "moderate," and his affect was "congruent with mood." R. 1084. He indicated that he had stopped taking the Prozac prescribed on January 18, 2019, because he was unable to tolerate it. R. 1086. Mr. Spearman stated that he didn't want to try any other interventions. R. 1086.

Mr. Spearman completed a home sleep study on December 19, 2018 that revealed moderate obstructive sleep apnea. R. 773–74. The Veterans Administration completed a C-PAP study on January 16, 2019 "for treatment of known moderate obstructive sleep apnea." R. 762–63. The study showed "[m]oderate obstructive sleep apnea effectively controlled with CPAP, including in supine REM sleep." R. 763. The Veterans Administration issued Mr. Spearman a C-PAP on February 12, 2019. R. 750.

On April 8, 2019, Mr. Spearman presented to the Veterans Administration clinic complaining of "right ankle pain and popping x 2 weeks" that "hurts worse in the mornings" and with movement. R. 990. Mr. Spearman reported that "he felt a popping sensation [] about 2 weeks ago after 'rolling it' and thinks it now pops off and on." R. 990. X-rays were taken, and Mr. Spearman was advised to rest, ice, and

wear supportive bracing and shoes. R. 992. The X-rays showed "[t]he alignment and mineralization are within normal limits without acute fracture or focal osseous erosions. There are mild patellofemoral and medial component degenerative changes of the right knee joint." R. 996.

On April 12, 2019, Mr. Spearman was seen by a nurse practitioner at the Veterans Administration, where he complained of carpal tunnel syndrome to his right hand. R. 980. He also reported numbness to his third and fourth digits. R. 980. He was referred to acupuncture. R. 982.

Mr. Spearman received a pain management referral from the Veterans Administration and was seen by the Birmingham Pain Center in 2019. R. 815–40, 857–90, 909, 948. He reported low back pain and right shoulder pain. R. 815. He also reported a past medical history of arthritis, back injury, depression, among others, and pain in his neck, lower back, hand, right wrist, left elbow, right shoulder, both feet, both knees, and hip. R. 818. He reported that he tried physical therapy but it "aggravated pain," and that the chiropractor "helped a little." R. 821. During these visits, Mr. Spearman's cervical spine and lumbar spine pain were discussed, and he was given medications for chronic pain syndrome. R. 828, 831, 835, 837, 857, 860–62, 869, 872–73, 880–81, 884.

Dr. Nitin Chhabra ordered an X-ray of the lumbar spine on July 19, 2019. R. 841–43. The impression was: "1. At L5-S1 there appears to be a 10 mm stable

anterior listhesis of L5 on S1 with an apparently intact facets without any L5 pars defect. No pars defect is seen on lateral nor oblique views. There is no movement of the anterolisthesis on flexion or extension. Suggest a CT for further evaluation of possible pars defect. 2. Stable flexion and extension without movement of the L5-S1 disc interspace. 3. L1-L5 is unremarkable." R. 841–42.

Mr. Spearman received a neurology referral from the Veterans Administration for treatment of his carpal tunnel syndrome. R. 914. He was scheduled for a right carpal tunnel release that took place November 15, 2019. R. 1103, 1170. He returned to the clinic on November 22, 2019 for a follow-up and again on December 2, 2019 to have his stitches removed. R. 1152, 1159. Notes from the December visit indicate that Mr. Spearman could "move all his finders including his thumb," but "his wrist remains stiff with some difficulty of flexion and extension." R. 1152.

Mr. Spearman presented to the Veterans Administration on June 10, 2019 complaining that the medication gabapentin "makes [him] feel stupid" and that he was experiencing lower back pain and right shoulder pain. R. 952. He also stated that he didn't "agree with what past records say about full range of motion to upper extremities." R. 952. At the visit, Mr. Spearman declined a repeat shoulder X-ray and a repeat lumbar spine MRI. R. 955. The Veterans Administration notes indicate they would enter an orthopedic and pain management consult. R. 955.

Mr. Spearman underwent an MRI of the cervical spine on September 11, 2019. R. 1090. The MRI found: "There is straightening of the cervical spine. The cervicomedullary junction and craniovertebral junction are unremarkable. No marrow edema. No soft tissue abnormality. A posterior disc herniation present at C6-C7 resulting in no canal or neural foraminal narrowing. The remaining disc levels appear unremarkable." R. 1091. The impression of the MRI was: "No significant cervical spine abnormality or degenerative changes." R. 1091.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.   Discussion

Mr. Spearman alleges that the ALJ's decision should be reversed and remanded because the ALJ committed error in making the decision. Doc. 16 at 1. Specifically, Mr. Spearman argues that the ALJ "commit[ted] reversible error by failing to find [his] history of anxiety and depression, bilateral carpal tunnel syndrome (CTS), cervical degenerative disc disease, and bilateral knee osteoarthritis to be severe impairments"; "commit[ted] reversible error in his failure to properly

evaluate the opinion evidence and Veterans Affairs disability determination"; and "fail[ed] to provide a full and fair hearing." *Id.*

### 1. The ALJ's Determination of Severe Impairments, Medical Improvement, and Residual Functional Capacity

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual claiming benefits must prove that he is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The burden is on the claimant to introduce evidence in support of his application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The governing regulations establish a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for benefits or supplemental security income. 20 C.F.R. §§ 404.1520, 416.920. The evaluator follows the steps in order. *See id.*

The second step of the sequential disability evaluation requires the ALJ to consider the combined severity of the claimant's medically determinable physical and mental impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A medically determinable impairment is severe if it significantly limits a claimant's physical or mental abilities to do basic work activities and lasts at least twelve months. *See id.* If a claimant does "not have a severe medically determinable

physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled." *Id.* "The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, [she] is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r*, 420 F. App'x 901, 902 (11th Cir. 2011). "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r*, 382 F. App'x 823, 824–25 (11th Cir. 2010) (stating "all that step two requires" is that the ALJ concluded the claimant "had a severe impairment").

When deciding a claim for cessation of benefits, to determine if there has been medical improvement, the ALJ must compare the medical evidence supporting the most recent final decision holding that the claimant is disabled with new medical evidence. *McAulay v. Heckler,* 749 F.2d 1500, 1500 (11th Cir.1985); *see* 20 C.F.R. § 404.1594(c)(1). "Medical improvement" is defined as "any decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled." 20 C.F.R. § 404.1594(b)(1); *see also* 20 C.F.R. § 404.1594(c)(1).

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual

functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The residual functional capacity "is not the *least* an individual can do despite . . . her limitations or restrictions, but the *most*." *Id.* The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The residual functional capacity assessment "must be based on *all* of the relevant evidence in the case record, such as: Medical history, Medical signs and laboratory findings, The effects of treatment . . . , Reports of daily activities, Lay evidence, Recorded observations, Medical source statements, Effects of symptoms . . . , Evidence from attempts to work, Need for a structured living environment, and Work evaluations, if available." *Id.* at *5.

20

It is the ALJ's exclusive responsibility to assess the claimant's residual functional capacity. *Moore v. Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016). The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Mr. Spearman argues that the ALJ erred at the second step in the analysis "in finding his additional impairments [were] non-severe and failing to address these limitations in the [residual functional capacity]." Doc. 16 at 14. In reply, Mr. Spearman also argues that the ALJ erred in finding medical improvement. Doc. 21 at 1–3. The Commissioner argues that the ALJ "properly found that [Mr. Spearman] experienced medical improvement related to his ability to work by comparing the

medical evidence," "satisfied step two by finding that [Mr. Spearman] had several severe impairments," and "included an analysis of [Mr. Spearman's] nonsevere impairments." Doc. 20 at 7, 14–15.

In her decision, the ALJ found that at the time of the comparison point decision, Mr. Spearman had the following medically determinable impairment: anxiety disorder. R. 17. The ALJ also found that Mr. Spearman had a "history of pes planus with plantar fasciitis, heart enlargement, right shoulder surgery with osteoarthritis, lumbar degenerative disc disease, knee and ankle sprains, gastroesophageal reflux disease (GERD), bilateral cubital and carpal tunnel syndrome with left carpal tunnel release, lower extremity neuropathy, sleep disturbance, obesity, and depression." R. 17. The ALJ noted that "[t]he medical evidence establishes that, since September 1, 2018, [Mr. Spearman] has had the same impairments as prior to September 1, 2018[,]" and the impairments listed above "are [Mr. Spearman's] current impairments." R. 17. While the ALJ identified Mr. Spearman's right should and lumbar impairments as "severe," she identified his other impairments as "nonsevere." R. 17–21. The ALJ also found Mr. Spearman's mental impairments to be "nonsevere" because he has only a mild limitation in the "four broad functional areas." R. 18–21.

The ALJ also found that a "[m]edical improvement occurred on September 1, 2018." R. 19. The ALJ cited the following medical evidence to support her finding of medical improvement:

> The claimant no longer takes medication for anxiety. On July 5, 2018, he told consultative psychologist Neville that he did not like taking the psychotropic medications that were prescribed and he had not taken any for a year or two. Despite the lack of medication, Dr. Neville[] concluded that the claimant demonstrated no more than mild impairment. On March 1, 2019, the claimant reported to the Veterans Administration that he was unable to tolerate Prozac and he did not want to try any other interventions. The claimant's depression screen on that date was negative. The claimant's back pain and other chronic pain is stable and currently treated at Birmingham Pain Center. The claimant told Dr. Neville that he had not taken any prescription medication in about a year. The claimant testified that during the time this disability claim was under review, he was watching his five children and not going to the doctor much.

R. 19. The ALJ found that Mr. Spearman's medical improvement is related to his ability to work because his "anxiety and other impairments no longer met or medically equaled listing 12.06." R. 19. At the comparison point decision Mr. Spearman had "marked limitations in social functioning and maintaining concentration, persistence or pace," but the ALJ found that "[t]here is no evidence of more than mild limitations in mental functioning since September 1, 2019." R. 19. Therefore, the Commissioner satisfied his burden of proof regarding medical improvement and cessation of benefits.

After making these findings, the ALJ specifically found that Mr. Spearman "continued to have a severe impairment or combination of impairments" under 20

C.F.R. § 404.1594(f)(6), and discussed the medical records related to these findings. R. 19–21. The ALJ identified Mr. Spearman's lumbar degenerative disc disease and osteoarthritis of the right shoulder as severe impairments. R. 19. Therefore, the ALJ satisfied step two of the sequential disability analysis. Mr. Spearman's argument that the ALJ erred by not categorizing additional impairments as severe fails.

Additionally, the ALJ specifically discussed each of Mr. Spearman's physical and mental complaints and incorporated his limitations into his residual functional capacity. R. 17–23. With respect to Mr. Spearman's anxiety and depression, the ALJ cited Mr. Spearman's adult function report, R. 284–91, Dr. Neville's psychological evaluation, R. 728–34, Mr. Spearman's inconsistent treatment with medication, and treatment notes reflecting mild symptoms. With respect to Mr. Spearman's carpal tunnel syndrome, the ALJ noted Mr. Spearman's treatment notes and surgeries on both the left and, more recently, right hand, for which the ALJ noted that Mr. Spearman was "still in the post-surgery recovery period." R. 20. With respect to Mr. Spearman's cervical degenerative disc disease, the ALJ noted that Mr. Spearman reported neck pain and right shoulder pain at the Veterans Administration neurology clinic in November 2019. R. 22. However, the "MRI of his cervical spine showed no significant abnormality or degenerative change in September 2019." R. 22. With respect to Mr. Spearman's knee arthritis, the ALJ noted his history of right knee pain and osteoarthritis diagnosis, as well as a January 2019 MRI that "showed no internal

derangement." R. 20. With respect to Mr. Spearman's pes planus and platar fascial fibromatosis, "[t]reatment records do not support ongoing limitations due to these conditions." R. 20.

The ALJ properly considered Mr. Spearman's testimony. In considering Mr. Spearman's symptoms, the ALJ first determined whether there were impairments that "could reasonably be expected to produce" those symptoms and second evaluated the "intensity, persistence, and limiting effects" of Mr. Spearman's symptoms "to determine the extent to which they limit the claimant's ability to do basic work activities." R. 21–22. The ALJ specifically considered Mr. Spearman's testimony regarding his back pain, range of motion in his right shoulder, his daily activities, his foot and knee pain, his recent surgery, and his metal impairments. R. 21–22. The ALJ concluded that she determined that Mr. Spearman's "medically determinable impairments could have reasonably been expected to produce some of the alleged symptoms," however his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence." R. 22. Mr. Spearman's statements were properly considered by the ALJ in forming the residual functional capacity.

Based on these findings, the ALJ limited Mr. Spearman to light work with "additional postural and reaching limitations to accommodate his impairments and to avoid exacerbating his pain." R. 23. "Concentrated exposure to vibration also was

precluded to avoid pain exacerbation. Exposure to hazards was precluded as a safety precaution, due to possible distraction from pain and mild mental symptoms." R. 23. Substantial evidence supports the ALJ's determination of Mr. Spearman's residual functional capacity.

### 2. The ALJ's Evaluation of Opinion Evidence and the Veterans Administration Disability Determination

As an initial matter, the court must determine the regulatory framework that applies to Mr. Spearman's second argument because new regulations were promulgated in 2017 that address how the ALJ should evaluate decisions by other governmental agencies and opinion evidence. *See* Doc. 16 at 24; Doc. 20 at 15–16. Mr. Spearman first argues that the new regulations do not apply because he originally applied for benefits in December 2014. Doc. 16 at 24. The Commissioner argues that "[t]he date of the initial request for review[, September 25, 2018,] served as the application date that dictated which regulations the ALJ applied in the decision." Doc. 20 at 15.

The application date of the original filing for social security benefits is not the same date applied to the review of cessation of those benefits. Rather, "a timely request for administrative review of a disability cessation determination or decision . . . constitutes a protective filing of an application permitting a determination of disability through the date of the final determination or decision on appeal." SSR 13-3p, 78 Fed. Reg. at 12,131. Thus, the application date to determine which

regulations apply for review of Mr. Spearman's disability cessation is the date of request for administrative review. *See Garcia o.b.o. AG v. Kijakazi*, No. 20-21918-CIV-COOKE/GOODMAN, 2021 WL 6294790, at *5 (S.D. Fla. Dec. 15, 2021); *Ruffin v. Kijakazi*, No. CV-120-177, 2021 WL 6205824, at *3 (S.D. Ga. Dec. 9, 2021). Mr. Spearman filed his request for administrative review through a hearing before an ALJ on September 25, 2018, marking the date of his application. The new regulations apply.

### a.   Opinion Evidence

Historically, the treating source rule provided that a treating physician's opinion was entitled to substantial weight unless good cause is shown to the contrary. *See* 82 Fed. Reg. 5844-01 at 5853 (Jan. 18, 2017); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (explaining the treating source rule). The SSA formalized the treating source rule in 1991 when it implemented regulations that required ALJs to "give more weight to opinions" from treating sources and to "give good reasons . . . for the weight . . . give[n] [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

The SSA's new regulations revise the definition of "medical opinion." "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . . (i) Your ability to perform

physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)." 20 C.F.R. § 404.1513(a)(2).

The SSA's new regulations also do away with the hierarchy of medical opinions and the treating source rule. *Id.* at § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id.* And the ALJ "will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* at § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* at § 404.1520c(c). It is not improper for an ALJ to consider a claimant's daily activities

when evaluating a medical opinion. *See id.* at § 404.1520c(c)(5) (stating that an ALJ may consider any other relevant factors "that tend to support or contradict a medical opinion"). Supportability and consistency are the most important of the five factors, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] . . . decision." *Id.* at § 404.1520c(b)(2). The ALJ may explain how she considered the remaining factors, but she is not required to do so. *Id.*

*First*, Mr. Spearman challenges the ALJ's treatment of the opinion of licensed clinical psychologist, Dr. Cynthia Neville. Doc. 16 at 25. Dr. Neville examined Mr. Spearman on July 5, 2018 and completed a Report of Psychological Evaluation. R. 728–32. Mr. Spearman reported to Dr. Neville that his "main thing" is his "physical stuff." R. 728. He stated that he underwent two shoulder surgeries that have "left him with limited use of his right arm." R. 728. He also reported right knee trouble – specifically that it "shifts." R. 728. Mr. Spearman reported suffering from shoulder, arm, ankle, foot, and knee pain or swelling. R. 728. He stated that he ran out of prescription medication "about a year ago." R. 728. Mr. Spearman was last seen by a primary care physician "over a year ago." R. 728. With respect to his anxiety and depression, Mr. Spearman stated that he received mental health treatment while in the military for a couple years and then for approximately a year through the Veterans Administration on an outpatient basis. R. 728. Mr. Spearman told Dr.

Neville that he "didn't like taking" the medications prescribed and had not taken psychiatric medication "for a year or two." R. 728. He denied compulsive disorder, but "stated that he suffers from anxiety" with these symptoms: "I get sweaty and nervous, at a loss for words. Just uncomfortable." R. 728. Mr. Spearman also discussed sleep problems. R. 729. At the time of his visit with Dr. Neville, he stated that he was not currently prescribed any medications. R. 729.

Dr. Neville's report includes a section on Mental Status, which discusses general appearance and behavior; characteristics of speech; mood and affect; and sensorium and cognition. R. 730–31. Specifically with respect to anxiety and depression, Dr. Neville stated:

> The claimant divulged a history of feelings of anxiety over the past 4 or 5 years with episodes of sweating, "a loss for words", and difficulty sleeping, but he did not detail symptoms that might fully support the diagnosis of Panic Disorder . . . currently. He described himself as "shy" and uncomfortable reading in front of others early on during his academic career, but Mr. Spearman did not list symptoms currently that would warrant the diagnosis of Social Anxiety Disorder. After being asked if he believed that he had been suffering from symptoms of depression recently, Mr. Spearman smiled when he answered, "Not since I got away from my ex-wife."

R. 731. Dr. Neville's diagnostic impression included generalized anxiety disorder and alcohol use disorder. R. 731.

In terms of Mr. Spearman's prognosis, Dr. Neville wrote that his "untreated mild symptoms of anxiety seemed unlikely to improve significantly over the next 12 months." R. 731. She also noted that Mr. Spearman "appeared to possess the

cognitive abilities to understand and remember work instructions, but his ability to follow through might be limited by his untreated symptoms of anxiety to a mild degree at this time. Mr. Spearman's ability to interact appropriately with coworkers and supervisors or to handle typical work pressures would be limited by his untreated symptoms of anxiety to a mild degree currently." R. 732.

The ALJ stated that "Dr. Neville diagnosed [Mr. Spearman] with anxiety, but not depression, and found that he had no more than mild limitations in any area of mental functioning." R. 23. The ALJ cited Dr. Neville's opinion and stated that it "is supported by clinical findings and consistent with other medical evidence, including treatment records." R. 18–19, 23. Substantial evidence supports the ALJ's findings, as the records from Mr. Spearman's own treating psychologists indicate that he was occasionally seen for outpatient therapy sessions, inconsistently took prescribed medications, and declined further intervention. R. 760, 1083, 1086.

Mr. Spearman argues that the ALJ disregarded Dr. Neville's opinion by finding his anxiety to be non-severe. Doc. 16 at 25. This argument on severity is discussed *infra* in Section V.1. The ALJ's decision indicates that she properly considered the opinion evidence from Dr. Neville and incorporated it into her decision, including her analysis of the severity of Mr. Spearman's impairments. *See* R. 18–19. The argument that the ALJ "substitute[d] her own lay opinion for that of Dr. Neville and Mr. Spearman's treating psychologists at the VA and disregards

31

these opinions without substantial evidence" fails. *See* Doc. 16 at 26. Instead, the record reflects that the ALJ properly evaluated the entire record including the objective medical evidence, Mr. Spearman's adult function report, and Mr. Spearman's testimony.

*Second*, Mr. Spearman challenges the ALJ's treatment of the consultative examination of Dr. Abiodun Badewa. Doc. 16 at 26. Mr. Spearman presented to Dr. Badewa on August 1, 2018 with current complaints of shoulder, back, and knee pain and plantar fasciitis. R. 735. The progress notes state that Mr. Spearman has a past medical history of anxiety and a surgical history of two right shoulder surgeries, abdominal surgery, and left hand surgery. R. 735. At the visit, Mr. Spearman reported that his back pain began four to five years ago, is located in his lower back, is severe and constant, and is aggravated by twisting and lifting. R. 735. Mr. Spearman reported that he had left knee pain following an injury in the military that resulted in surgery and that the pain was moderate and aggravated by kneeling, standing, and walking. R. 735. Mr. Spearman reported that his right shoulder pain still limited his activity despite two shoulder surgeries and that it is aching, sharp with motion and worse with activity. R. 735. Mr. Spearman reported that his plantar fasciitis was worse in the right heel and aggravated by ambulation early in the morning. R. 735. At the visit, Mr. Spearman denied sleep disturbances, anxiety, depressed mood, psychiatric condition, and stressors. R. 735–37.

Dr. Badewa's physical examination revealed in part:

BACK: Dorsolumbar spine range of motion is significant for flexion, extension, right and left lateral flexion and rotation. spine nontender to palpation, no kyphosis, no scoliosis.
GAIT: Normal
STATION: Normal
MUSCULOSKELETAL: HIP: Range of motion is significant for reduced flexion, internal and external rotation bilaterally.
KNEE: Reduced knee flexion bilaterally.
FEET/ANKLE: Normal
SHOULDER: Range of motion of the right shoulder is significant for reduced abduction, adduction, forward elevation, internal and external rotation.
LEFT SHOULDER: ROM is significant for reduced forward elevation only.
ELBOW: While the left elbow has normal range of motion while the right elbow has reduced flexion, supination and pronation.
WRIST: While there is normal range of motion on the left wrist, the right wrist has reduced palmar- or dorso-flexion.
EXTREMITIES: There is a normal range of motion of all left fingers while there is a reduced MCP PIP flexion, no clubbing, cyanosis, or edema, good capillary refill in nail beds.
RIGHT WRIST: 4/5
LEFT WRIST: 5/5

R. 736.

The ALJ cited Dr. Badewa's consultative physical examination in her findings. R. 23. She stated:

> The claimant underwent a consultative physical examination in September 2018. He reported back pain, right shoulder pain, left knee pain, and heel pain, worse on the right. Abiodun Badewa, M.D., noted reduced range of motion in the claimant's dorsolumbar spine, hips, knees, and shoulders, as well as his right elbow, forearm, and wrist. Dr. Badewa also noted mildly reduced right grip strength. He diagnosed the claimant with sequela of a right

shoulder injury, plantar fascial fibromatosis, left knee joint
stiffness, and pain at various sites.

R. 23 (internal citations omitted). As noted by the Commissioner, the record shows

that Dr. Badewa performed only a consultative examination and did not render an

opinion. R. 735–37; *see* Doc. 20 at 21–22. Mr. Spearman cites a chart to assess

dexterity and grip strength. R. 739; *see* Doc. 21 at 10. It appears that Dr. Badewa did

incorporate these examination findings in his Progress Notes, which state: "RIGHT

WRIST: 4/5; LEFT WRIST 5/5." *Compare* R. 736 *with* R. 739. Additionally, the

ALJ specifically referenced these findings in her decision. R. 23. As argued by the

Commissioner, these examination findings do not constitute opinion evidence.

Because Dr. Badewa did not render an opinion, the ALJ was not required to consider

his consultative physical examination as such.

     **b.**    **Veterans Administration Disability Determination**

Effective September 28, 2014, the Veterans Administration "assigned a

permanent 100% disability evaluation" for Mr. Spearman's "service connected

disability/disabilities." R. 173. The disability percentage was assigned: unspecified

anxiety disorder (also claimed as sleep disturbance, depression) – 50%; bilateral pes

planus with plantar fasciitis (claimed as flat feet) – 30%; biatrial enlargement

(claimed as palpitation, heart) – 30%; right shoulder strain – 10%; lumbar

spondylolisthesis, spondylolysis (claimed as lower back pain) – 10%; left knee

sprain – 10%; right knee sprain – 10%; left ankle sprain – 10%; right ankle sprain –

10%; gastroesophageal reflux disease (claimed as acid reflux) – 10%; left upper extremity cubital tunnel syndrome – 10%; right upper extremity cubital tunnel syndrome – 10%; left lower extremity sensory neuropathy – 10%; right lower extremity sensory neuropathy – 10%. R. 173. It is this determination that Mr. Spearman challenges was not properly considered by the ALJ. *See* Doc. 16 at 23.

Prior to March 27, 2017, the Commissioner's regulations and Eleventh Circuit precedent instructed the ALJ to assign "great weight" to the Veterans Administration disability rating. *See* 20 C.F.R. § 404.1504; SSR 06-3p ("the adjudicator should explain the consideration given to [a Veterans Administration disability decision] in the notice of decision for hearing cases"); *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (quoting *Bloodsworth*, 703 F.2d at 1241) (holding "[t]he findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight"); *Ostborg v. Comm'r of Soc. Sec.*, 610 F. App'x 907, 914 (11th Cir. 2015) ("A VA rating, while not binding on the SSA, is evidence that should be considered and is entitled to great weight.") (cleaned up). "Great weight" does not mean controlling, but "the ALJ must seriously consider and closely scrutinize the VA's disability determination and must give specific reasons if the ALJ discounts that determination." *Brown-Gaudet-Evans v. Comm'r of Soc. Sec.*, 673 F. App'x 902, 904 (11th Cir. 2016).

Pursuant to the revised regulations, applicable to claims filed after March 27, 2017, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). As to other agency determinations, such as a Veterans Administration disability determination, the new regulations state that "we will not provide any analysis in our determination or decision about a decision made by any other governmental agency . . . about whether you are disabled, blind, employable, or entitled to any benefits." 20 C.F.R. § 404.1504. Moreover, the regulations specify that Veterans Administration disability ratings constitute evidence that is "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c)(1). Nevertheless, the regulations require the ALJ to "consider all of the supporting evidence underlying the other governmental agency['s] . . . decision that [the ALJ] receive[s] as evidence in [a plaintiff's] claim." 20 C.F.R. § 404.1504; *see also Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1324 (11th Cir. 2020) (affirming new regulations no longer require analysis of agency determinations, but supporting evidence must be considered).

Accordingly, the court is not persuaded by Mr. Spearman's argument that the ALJ erred by not properly evaluating his 100% disability rating by the Veterans Administration. Under the new regulations, the ALJ was not required to assign any

persuasiveness or provide any analysis of the Veterans Administration disability rating. *See* 20 C.F.R. §§ 404.1504, 404.1520b(c)(1). Rather, the ALJ was required only to consider the evidence underlying the Veterans Administration decision. *See id*. To the extent Mr. Spearman argues that the ALJ erred by not considering the evidence underlying the decision, the court finds such argument unpersuasive because of the ALJ's comprehensive assessment of all the evidence received in Mr. Spearman's claim under 20 C.F.R. § 404.1513, much of which is his treatment at the Veterans Administration and through Veterans Administration referrals. *See* R. 17–23.

### 3.  Hearing Before ALJ

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "A Social Security claimant has a statutory right, which may be waived, to be represented by counsel at a hearing before an ALJ." *Id.* An unrepresented claimant is not prejudiced, however, when the ALJ's "decision is based upon substantial evidence appearing in the record as a whole." *Edwards v. Sullivan*, 937 F.2d 580, 586 (11th Cir. 1991). The ALJ's duty to develop the record exists even when the claimant is represented by counsel. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). "However, there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree

that the case must be remanded to the [Commissioner] for further development of the record." *Graham*, 129 F.3d at 1423 (cleaned up). In determining whether to remand for further development, "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id.* (cleaned up).

"In order for a Vocational Expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Although Mr. Spearman was not represented by counsel at the ALJ hearing, he was represented by counsel through the Appeals Council process, and his attorney filed a "Brief in Support of Review of ALJ Decision." R. 348–50. Mr. Spearman does not indicate what additional fact could have been submitted by his attorney that might have changed the outcome. Accordingly, to the extent Mr. Spearman is arguing that he did not receive a full and fair hearing because he was not represented by an attorney, that is not a basis for reversal of the ALJ's decision.

Mr. Spearman also argues that he did not receive a full or fair hearing because the ALJ did not obtain "additional medical evidence from Dr. Hogan and neurologic

testing related to his right carpal tunnel and cubital tunnel syndrome" or "the EMG nerve conduction studies referenced in the record and testified to." Doc. 16 at 29.

The ALJ specifically discussed Mr. Spearman's surgery and the related records in her decision, which states:

> EMG and NCV testing showed mild ulnar neuropathy and moderate median neuropathy, and he underwent a right carpal tunnel release in November 2019. The record does not support ongoing limitations prior to surgery, and the claimant is still in the post-surgery recovery period. He testified that his stitches were removed three days before the hearing.

R. 20; *see also* R. 39. The medical records indicate that the Veterans Administration referred Mr. Spearman to a neurologist for his carpal and cubital tunnel syndrome, and that testing was completed. R. 915, 1015, 1037. The ALJ's decision indicates that she considered both the testing and that the results necessitated surgery. Because the ALJ considered this medical evidence – including the testing not in Mr. Spearman's file – there is no prejudice to Mr. Spearman and remand is not warranted.

With respect to the vocational expert testimony, the ALJ determined that Mr. Spearman had the residual functional capacity to:

> perform a light level of exertion as that term is defined in the regulations except he can occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds. He can occasionally reach with the right upper extremity and frequently reach with the left upper extremity. He should

> avoid concentrated exposure to vibration and any exposure
> to hazards.

R. 21. At the hearing, the ALJ asked the vocational expert a series of hypothetical questions. R. 58–60. After explaining that the individual was a younger individual, with a high school education and Mr. Spearman's work experience, the second hypothetical the ALJ asked was:

> If the same hypothetical individual could perform work at a light level of exertion, as that term is defined in the regulations, except he could occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds. He can occasionally reach with the right upper extremity, frequently reach with the left upper extremity, and as before he should avoid concentrated exposure to vibration and any exposure to hazards. Would there be jobs he could perform?

R. 58–59. It was in response to this hypothetical that the vocational expert testified that the hypothetical individual would be able to perform the cashier, marker, and garment sorter jobs. R. 59.

The ALJ included all of the limitations in Mr. Spearman's residual functional capacity in the hypothetical she posed to the Vocational Expert. Therefore, the Vocational Expert's testimony was based on a proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

## VI.   Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 30th day of September, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE